

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 20 2012

JAMES W. McCORMACK, CLERK
By:_____ J Brown
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**HARRIS EDDY STANLEY PRIVATE LIVING TRUST**

        **Plaintiff,**

        **v.**        Case # 4:12-CV-735 SWW

**STATE OF ARKANSAS**
**WILLIAM BILL JAMES**
**JOHN JOHNSON**
**MARIANNE SATERFIELD**
**RONNIE SMITH**
**JOHILDA HARRIS**
**MICHAEL FORD**
**CHANDRA BASKIN**
**JARVIS MCKELLER**

This case assigned to District Judge Wright
and to Magistrate Judge Volpe

        **Defendants**

## <u>COMPLAINT</u>

**Comes now, Plaintiff, HARRIS EDDY STANLEY PRIVATE LIVING TRUST, Eddy Stanley Harris, Trustee, Eddy Stanley Harris, US Creditor and for his complaint states; Eddy Stanley Harris, Jr. was found guilty by an unjust court having no effective counsel in his defense by the state of Arkansas and now states this complaint.**

    The State of Arkansas, by power, did take property without proper due process in violation of Constitutional Rights and Human Rights.  Eddy's Sixth amendment rights were violated by taking away his right to a just trial by ineffective counsel and a sleeping juror.  The Right to confront the Witnesses against him, the right to have witnesses in his favor and the right to have assistance of effective counsel for his defense

The Contract made with the State of Arkansas is invalid due to Power of Attorney, default of contract, without full disclosure, and Treason against the United States Government.  The State of Arkansas has not made decisions according to Commercial or Constitutional Laws in these cases.

1

State of Arkansas v. Eddy Stanley Harris, Jr.
In the Circuit court of Pulaski County Arkansas
Fourth Division
**No. CR 2003-2315   - (The Honorable John W. Langston)**, (Jury Trial) –Found Guilty – Pleaded Not
Guilty

       **Date of Judgment of conviction – March 15, 2005**
       **Date of Sentencing – March 31, 2005**
       **Length of Sentence – two (2) life sentences w/o parole**
           **Two consecutive counts of Capital Murder**
           **ADC #: 132946**

In the Arkansas Supreme Court
Eddy Stanley Harris, Jr. Appellee
State of Arkansas, Appellee
**No. CR 05-751 (The Honorable John W. Langston)**
       **Appeal Denied**
           The circuit court erred in denying the appellant's motion for a directed verdict when the
           state failed to prove beyond a reasonable doubt that the appellant committed any murders.

In the Supreme Court of Arkansas
Eddy Stanley Harris, Jr., Appellant
State of Arkansas, Appellee
**No. CR 07-1247 (The Honorable John W. Langston)**
       **Date of Result – September 26, 2008**
       Appeal Denied
           Appellant raised a single point on appeal in which he content that the trial court erred by
           failing to find that trial counsel was ineffective on Rule 37 petition.

Harris V. Norris
United States District Court
Eastern District of Arkansas
Western Division
**No. 4:09CV00276 SWW Filed December 28, 2010**
       Action: Petition to reinvest the trial court with jurisdiction to consider a petition for writ of error
Coram nobis.
**1-5-2012, Judgment:  The appeal is dismissed, The United States Court of Appeal for the Eight
Circuit filed a decision denying the request to appeal the decision of the federal trial judge who
denied the request for a new trial.**

The State of Arkansas decision in this case and the appeals were not based on Commercial Law,

Constitutional Law or Treaty Law.  Due to the State of Arkansas inability to make just decisions in this

case HARRIS EDDY STANLEY PRIVATE LIVING TRUST, do take sole control over contract <u>431-65-</u>

2329, through Power of Attorney, and file # 2012033823 filed in HARRIS EDDY STANLEY PRIVATE LIVING TRUST UCC Contract #40000044452760. No payments from this 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, contract should be accessible by the Corporation State of Arkansas, for his incarceration. The states of Arkansas no longer have any right to this contract. The Contract of Eddy Stanley Harris, Jr. now rest with the HARRIS EDDY STANLEY PRIVATE LIVING TRUST. Eddy Harris, Jr. is now a Trustee, Living Soul and a Private American Citizen. The Trust is requiring the Corporation STATE of ARKANSAS to show cause by the Constitution, Common Law, or treaty law. The TRUST makes all claims to Eddy Stanley Harris Jr., contracts and person.

**My complaint further states**:

**I.**      The Trial court abused its discretion when it did not suppress the pretrial identification of Eddy Harris, Jr. because the identification process was unduly suggestive.

A pre-trial identification process filed by Eddy Harris, Jr. to suppress Jarvis McKeller's tainted and unduly suggestive identification of him was denied by the trial court. This pretrial identification violated the due process clause of the Fourteenth Amendment when there were suggestive elements in the identification procedure that made it all but inevitable that he would be identified as the culprit. Mr. McKeller did not witness the "act", which was the shooting of the victims.

King v. State, 323 Ark. 558, 561, 916 S.W.2d 725 (1996).

**II.**      The Trial court abused its discretion when it denied Mr. Harris's motion in limine to prohibit Ms. Baskin from testifying that two weeks prior to the shootings, she heard Mr. Hall and Mr. Harris planning a robbery because her testimony on that point was irrelevant, unduly prejudicial, and inadmissible as a prior bad act.;

On May 8, 2003, over a year after the shooting, Ms. Baskin gave a one hour, forty-three page statements to Detective Smith, and nowhere in that lengthy statement did she say that Mr. Harris planned to rob the victims, Mr. Dison and Mr. Tedder, or that Mr. Harris planned to commit a murder. Under cross examination at the trial, Ms. Baskin was forced to admit that she deliberately withheld vital information from Detective Smith and she did so because he "didn't ask the right question." She further admitted that her testimony about hearing a robbery plot two weeks before the shooting was "new testimony." Clearly, Ms. Baskin's allegation about a so-called robbery plot was a fabrication. Even if was not, it was so devoid of the slightest indicia of truth or reliability that it should have been excluded as irrelevant under Rule 401 of the Arkansas Rules of Evidence. Relevant evidence is evidence having any tendency to make

the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R.Evid.401. By her own admission, Ms. Baskin did not hear Mr. Harris mention one word about Mr. Dison, Mr. Tedder, guns, drugs, money, or anything else pertaining to the shooting of Mr. Dison and Mr. Tedder. Whatever she claims she heard, it certainly was not something that can be described as making it more probable that Mr. Harris participated in a murder. Even if her statement could survive Rule 401 scrutiny, it should have been excluded under Rule 403. All relevant evidence is not admissible. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid.403. There is no probative value to Ms. Baskin's post hoc allegation that she overheard a robbery plot two weeks prior to the shootings. She conjured the whole thing up right before Mr. Hall (her boyfriend at the time) went on trial. If, however, there were a shred of probative value to her allegation, it was substantially outweighed by the danger of unfair prejudice to Mr. Harris.

Detective Smith was the lead investigator in this case and he stated under oath that there was no physical evidence connecting Mr. Harris to the shooting of Mr. Dison and Mr. Tedder. In fact not a single witness the State produced could establish that Mr. Harris even knew Mr. Dison or Mr. Tedder or could place him at the scene of the crime. Once the jury heard Ms. Baskin's contrivance that doomed any chance Mr. Harris had to receive a fair trial. It cannot be seriously argued that her "robbery plot" allegation did not convince the jury that Mr. Harris participated in the murder of Mr. Dison and Mr. Tedder. To allow such unreliable statement to be heard by the jury was an abuse of discretion and was a grave error. Mr. Harris should have been able to receive a new trial.

A very high degree of similarity between the charged crime and the prior uncharged act is required. Evidence offered under rule 404(b) must be independently relevant and have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable that it would be without the evidence. Bragg v. State, 328 Ark. 613, 946 S.W.2d 654 (1997). In this case, there is no similarity, let alone a high degree of similarity, between Ms. Baskin's vague, uncorroborated allegation of a preexisting robbery plan and the violent deaths of Mr. Dison and Mr. Tedder. At bottom, the trial court's decision to allow the jury to hear this spurious testimony was a consequential enough error that a new trial is the only appropriate remedy.

**III.** The State has the burden of proof; The State or District Attorney's office, is held to a strict standard of proof because it is attempting to take a United States Citizen and place him in prison for the remainder of his life. **Capitol Murder carries an automatic life sentence in Arkansas without parole. No exceptions, no suspension, no parole, nothing. If the defendant is convicted of Capitol Murder, he will go to prison for the rest of his life – he will die in prison. With such serious consequences,**

the State is held responsible, as they should, to a strict standard of proof – the state must prove each element of the case beyond a reasonable doubt. In this particular case, suggestion, hearsay, speculation, habitual liars, convicted felons, past Police informant, sleeping jurors and pretrial tainted identification process all were steps leading to the deprivation of Mr. Harris's Sixth Amendment rights. A list of Eye witnesses to the crime was never questioned by Mr. Harris's State Appointed Attorney by reason of the fact that he stated they could not be found. Sufficient evidence was shown that Mr. Harris did not receive effective assistant of counsel on several grounds. The primary ground was that Mr. James did not call witnesses who could have created reasonable doubt as to Mr. Harris's guilt. Mr. James did not speak to any of these witnesses, let alone subpoena them. All the witness from Linda Gibson through Wardell Woods, identified someone other than EJ Harris as the person who committed this double homicide. Even though some of their statements might have been inconsistent, there were several versions as to who committed this crime. At the very least, if any of these witnesses were called, they could have created doubt, not only reasonable doubt, but substantial doubt.

Cited is **State of Arkansas v. Dwayne D. Dillard,** 338 (R.463) ARK. 571, 998 S.W. 2d 750. In this case the court found that it was ineffective assistance of counsel if a defense Counsel failed to call a witness who could have created reasonable doubt as to the credibility of the States primary witness. As in that case, this was a case where a man was charged with sexually molesting two young men, but the defense counsel failed to call the oldest sister of these two younger women that these sisters gave false testimony and the court ruled that it was ineffective assistance of counsel because the defense counsel didn't call a witness who could have created doubt or impeached the credibility of the States principal witness in that case.

Cited is **State v Clemmons,** 976 S.W. 2d 923 (1998) 334, ark. 440 (CR 98-296). In the federal proceeding, the district court, relying largely on *Robinson v. Norris,* 60 F.3d 457 (8th Cir.1995), held Clemmons's right to counsel was violated in each of the five state convictions, and directed that a writ of habeas corpus should issue unless Clemmons was allowed to pursue post conviction proceedings in state court. *Id.*

That is the case here. The question is did he receive a fair trial and did he receive a fair opportunity to present a reasonable defense. EJ Harris did not receive this defense in this case. Mr. James called not a single witness on his behalf and he contends he didn't call the witnesses because there may have been some issues about their credibility. At the same time he (R. 464) introduced no evidence in this case. There was ample evidence available to him that he could have substantially impeached the credibility and

the veracity of the States primary witness, Johilda Harris.  There was no direct evidence tying Mr. Harris to the crime.  There were no eye witnesses stating that Eddy Harris committed this crime.  There were no fingerprints or any physical evidence tying Mr. Harris to the crime.  The only evidence they have, that the State presented in this case, allegedly came out of the mouth of Mr. Harris's own mouth where he allegedly admitted that he committed those crimes.  That was testified to by Johilda Harris.  Because there were no witnesses there and there were many available who could have been called, Mr. Harris didn't receive a fair trial.  He was not afforded a reasonable defense of the charges.  In addition, he had the alibi witnesses that he could have made and he failed to make.  Witnesses that allegedly couldn't be found by Mr. James could have presented a reasonable defense.  None of the State witnesses placed Mr. Harris at the scene of the crime, nor did they testify that he was at the scene of the crime.  The state did not prove beyond a reasonable doubt that Mr. Harris robbed, attempted to rob, or kill Mr. Dison or Mr. Tedder.  These are grounds for Treason and dismissal of the State interest in Contract 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.

**IV**. The pretrial identification of Mr. Harris was so tainted it should have never been allowed to be seen or herd by the jury.  Likewise, Ms. Baskin's testimony about hearing a pre-existing robbery plot between Mr. Harris and Mr. Hall should have been excluded as irrelevant, unduly prejudicial, or inadmissible as a prior bad act.

## PARTIES

1. HARRIS EDDY STANLEY PRIVATE LIVING TRUST, Trustee; HARRIS EDDY STANLEY, US CREDITOR, A Private American Citizen.
2. Eddy Stanley Harris, Jr., Trustee, Living Soul and Private American Citizen.
3. STATE OF ARKANSAS – A Foreign Corporation with the right to be sued.
4. WILLIAM BILL JAMES- A Foreign Corporation, Officer of the Court with the right to be sued.
5. JOHN JOHNSON – A Foreign Corporation, Officer of the Court with the right to be sued.
6. MARIETTA STATTERFIELD – A foreign Corporation, Officer of the Court with the right to be sued.
7. JOHILDA HARRIS – A Foreign Corporation with the right to be sued.
8. MICHAEL FORD – A Foreign Corporation with the right to be sued.
9. RONNIE SMITH – A Foreign Corporation with the right to be sued.
10. CHANDRA BASKIN – A Foreign Corporation with the right to be sued.
11. JARVIS MCKELLER – A Foreign Corporation with the right to be sued

## FACTS

**IN 2005, A JURY FOUND APPELLANT EDDY STANLEY HARRIS, JR., GUILTY OF TWO COUNTS OF CAPITAL MURDER AND SENTENCED HIM TO TWO (2) CONSECUTIVE TERMS OF LIFE IMPRISONMENT WITHOUT PRAROLE.**

## WILLIAM BILL JAMES, ATTORNEY

William Bill James used the words of a drunken man, intoxicated on hydro-cortisone pills (taking for a gun shot injury), beer and Marijuana to prosecute him in this case, **CASE# CR2003-3900.** He, (William Bill James) removed all evidence of drugs use to criminally prosecute him on words of an intoxicated man that were to be protected by law. William Bill James placed and tried **Case# CR2003-3900** first to take away his rights to testify in the case of the double homicide **CASE#2003-2315**.

There was no defense on his behalf from his state appointed Attorney, William Bill James which negated Eddy Stanley Harris, Jr's Sixth amendment right. **State of Arkansas v. Dwayne D. Dillard,** 338 (R.463) ARK. 571, 998 S.W. 2d 750

William Bill James was given a note from his paralegal that jury #3 was asleep. The note was given to him twice throughout the trial. William Bill James did not call a mistrial and Eddy Stanley Harris, Jr. was found guilty by a sleeping juror.

William Bill James was an Attorney handling another case for a Pulaski County inmate by the name of Charles Stevenson. Bill James was soliciting inmates who would testify against his client, Eddy Harris, Jr. This inmate wrote three (3) statements to this effect. **(EXHIBIT 2,3 & 4) Case# CR 07-1247** Charles Stevenson was offered money for his testimony against Eddy Harris, Jr.

Several witnesses to the crime gave statements to the LRPD ruling out Eddy Harris Jr. as a suspect. These witnesses that gave statements to the LRPD were never questioned by William Bill James in case# CR03-2315 include:

**LINDA GIBSON, 301 SOUTH OAK, LITTLE ROCK, AR**

Ms. Gibson stated she witnessed the two homicides that occurred on May 3, 2002.  She stated she was two (2) houses down from where the homicides occurred in the backyard of the house of a friend. She stated that she witnessed two black males approaching the Red Truck in which the two homicide victims were seated in a crouching like manner.  She stated that there was a third older black male standing behind the Red Truck.  She said this older black male is known to hang around Pik-Pak store.  When the two black males reached the truck, Ms. Gibson states that she witness one of the black males shoot the driver of the truck, the white male victim, numerous time with the hand gun. She saw the other black male shoot the passenger in the truck, the black male victim, numerous times with what she described as a machine gun or automatic riffle.  Ms. Gibson personally knew the black male who shot the driver as "Bookie" because he lives in the neighborhood in which Ms. Gibson lived and his children went to the same school in which Ms. Gibson's children attended.  Ms. Gibson identified "Bookie" from a photo spread listed as Reginald Foster a/k/a Cool Cat.  Ms. Gibson identified Telly Lee Clark as the black males she witness shoot the black male passenger in the truck with the "long gun".  Ms. Gibson did not identify either of the black male shooters as the petitioner, Eddy Stanley Harris, Jr. being at the crime scene.

**TONY ANDERSON, 3607 ZION STREET, LITTLE ROCK, AR**

Mr. Anderson identified the two black males as Reginald Foster, a/k/a, Cool Cat, and "Little Pyroo", who Mr. Anderson saw accompany Cool Cat toward the scene of the homicide a few minutes earlier. When Mr. Anderson saw the two black males running from the alley, he saw Cool Cat throw away a pistol as he was running away. His statement did not include Eddy Harris, Jr. as being at the crime scene.

**AARON SHELTON, 2803 WEST 13TH, LITTLE ROCK, AR**

Aaron Shelton gave a statement on June 20, 2002 to detectives of the LRPD concerning the subject homicides.  Mr. Shelton and his girlfriend were driving near the scene of the homicides. At this time, Shelton saw a black male running in a ducking and dodging manner from the area of the scene of the homicides. Shelton saw this black male holding an object in his waist which appeared to be a gun. Mr. Shelton identified this black male as Reginald Foster a/k/a Cool Cat. His statement did not include Eddy Harris, Jr. as being at the crime scene.

## CURTIS PERRY, 621 MAPLE STREET, LITTLE ROCK, AR

Curtis Perry gave a statement on August 1, 2002. Perry was in the yard of a house when Cool Cat and a young black male, "YG", approached Mr. Perry. Cool Cat asked Perry had he heard any information about the homicides. Perry said no. Cool Cat said he was looking for Lisa because she was saying that Cool Cat had committed the homicides. Perry did asked Cool Cat whether he killed the two homicide victims. Cool Cat then told Perry that he (Cool Cat) and YG did in fact commit the homicides. Cool Cat said that he has set the victims up to rob them of their money. He robbed them upon the pretense that he was going to sell them drugs. Cool Cat ordered YG to shoot the victims. But YG was too frightened to do it. Cool Cat then claimed that he shot the victims with an SKS or Mac 90.

## WARDELL WOODS, 4218 WEST 14TH ST, LITTLE ROCK, AR

Wardell Woods gave a statement concerning the subject homicides on May 22, 2002. Woods stated that Cool Cat approached him at the "store", (Pik-Pak) and asked Woods whether he had seen any police in the area. Woods replied that he had not seen any police. Cool Cat stated that he wanted to know. He was the one that did the killing. Cool Cat stated that he killed the victims for the money. Woods stated Cool Cat owned a 9mm gun. A 9mm was one of the guns used to kill the victims. Woods identified Cool Cat from a photo spread. Woods further stated that there was an older black male, known as Pete, who told Woods that he witnessed Cool Cat shot the homicide victims. Pete is the elderly man known to hand out at the Pik-Pak store and was near the scene of the homicide when he saw Cool Cat kill the victims. Pete is also the older black male that Linda Gibson (Exhibit #1) described as the older black male standing behind the truck when the two victims were shot. Wardell Woods was deemed to be a reliable and credible witness by the Police. The information he provided was corroborated by the evidence at the scene. Eddy Harris, Jr. was ruled out as being at the scene of the crime.

## VISHAY FRANKLIN, 5001 WEST 30TH, LITTLE ROCK, AR

Vishay Franklin gave a statement pertaining to the subject homicides on May 8, 2002 to the detective of the LRPD. Jarvis McKeller testified on behalf of the state that he; Vishay Franklin, (McKeller's girlfriend at the time), Cameron Brazwell and Latoya were in a car in the back yard of McKeller's sister house, near the scene of the homicide. A few minutes later they heard shots. Then a black male with blood on his t-shirt banged on the car window. This black male offered $200 to get a ride from away from the crime scene   McKeller testified that Franklin drove them , and this black male to the house of the Petitioner. McKeller testified that he and this black male went into a rec. room adjoining

9

the house.  There McKeller testified that he saw Petitioner, Larue Hall and Cool Cat arguing about who retrieved the money from the homicides victims.  Vishay Franklin and her statement refutes Jarvis McKeller's version of the events.   Vishay Franklin stated that she did not drive the person McKeller so call identified as Larue Hall to Petitioner's residence.  She states that 30 minutes after the shots, a black male, "Little Rickie", asked her for a ride to 19th and Maple.  She then drove this person to 19th and Maple.  He exited the car.  Franklin then drove away.

**CAMERON BRAZWELL, 6510 MABELVALE CUT OFF, Y13, LITTLE ROCK, AR**

Cameron Brazwell gave a statement to the detective of the LRPD on December 20, 2003.  Brazwell refutes McKeller claim that Vishay Franklin drove Larue Hall to Petitioner's residence following the murders and McKeller went into to the Petitioner's house.  Brazwell states that he and the others were in Franklin's car when a black male tapped on the window.  He asked for a ride.  He said there were people after him.  Franklin drove this male to Pine and Cedar and Franklin drove off.  No one in Franklin vehicle went into to any house.  Brazwell did not identify the black male who was given a ride from the photo spread.

**KEESHA EPTING, 1104 EAST 11TH STREET, APARTMENT 102, LITTLE ROCK, AR**

Keesha Faye Epting, have lived in Little Rock for about seven and a half, eight years.  Ms. Epting stated that she knew Eddy Stanley Harris, Jr. as her cousin.  Eddy Stanley Harris, Sr. Ms. Epting stated him as her uncle.  Johilda is Ms. Epting's mother.  She recalled an occasion in 2004 when Eddy Harris, Sr. came to the apartment of Zambie Ford (her sister).  Mr. Harris was bringing some furniture and he was coming to see my sister's husband, Cecil Ford.  He wanted him to move the furniture.  Johilda Harris answered the door when Eddy Harris, Sr came to the apartment.  (R. 263) Eddy Harris, Sr. was getting ready to leave the apartment when she opened the door, but she asked to come in.  He paused for a little while, but she kept asking him to come in, so he came inside.  She asked him to stay.  He was in the process of walking away.

She recalled in May 2002 there was a case where two young men were killed in an area over on 12th street in Little Rock.  She was made aware of the killing of the two young men by the Newspaper and Television.  She was also aware that Johilda Harris had given a statement to the LRPD regarding the involvement of Eddy Harris, Jr. in (R.264) those killings.  Eddy Harris, Sr. and Johilda Harris had a conversation about the statement she gave to the LRPD regarding Eddy Harris, Jr. involvement in those killings.  He asked Johilda if if EJ told her

anything about what happened and she said no.  He also asked her to just tell the truth.  She told Eddy Harris, Sr. that EJ did not tell her he had anything to do with those killings.  Zambie Joy (Keisha's sister), Keisha and Zambia Joy's Friend (Marcus) were present and in a position to hear the conversation between Johilda Harris and Eddy Harris, Sr.  All of those people were present and heard Johilda say that EJ never told her that he was (R. 265) involved in these killings.  Keisha spoke to EJ's attorney, Bill James, about the conversation she overheard with Johilda.  That was before he went to trial in this case.  It was a short time before the trial.  Mr. James spoke with her about information that Keisha had pertaining to this case.  The conversation occurred at his office.  Eddy Stanley Harris, Sr. was there when she went to Mr. James office to speak about this case.  (R. 266) Keisha spoke with Mr. James alone.  She told Mr. James that Johilda told Eddy Harris, Sr. and me that EJ never told her that he had killed the young men or was involved in those killings.  My meeting with Mr. James lasted 10 to 15 minutes.  I observed Mr. James taking notes while I was speaking to him.  She believed it was recorded.  She doesn't recall specifically.  She was called as a witness in the trial of Eddy Harris, Jr.  I did not testify (R. 267). She wasn't called as a witness.  She did appear at the court house.  Mr. James did not give any reason why she was not called as a witness in the trial of Eddy Harris, Jr.  She didn't ask.  He never contacted Keisha as to why she was never called.

Johilda Harris testified in the trial that she never received any payment or was ever promised any payments for her testimony on the behalf of the State against EJ.  Johilda Harris told Keisha that she received money for her testimony in the trial of Eddy Harris, Jr.  That was a short while after the trial. Johilda said she received (R. 268) from $1,000 to about $2,000. Somewhere in between 1,000 and 2,000 (R.269).


## JACQUELY HARRIS COBBS –2200 S OAK STREET, LITTLE ROCK, AR

Eddy Stanley Harris, Jr. is Jacquelyn's brother.  Jacquelyn had a recollection that in May, 2002 there were killing of two young men in the area of 12th street in Little Rock, AR.  She was at home that day.  It was at 2200 S. Oak in Little Rock, AR.  At that time she had lived at 2200 S. Oak throughout her childhood (R. 283).  She left 2200 Oak as her residence in about the year 2000.  She left in 2000, 1999, but she came back and then she left in 2003.

She have lived there 10 years at the time she was living there. She had been living there for some time. She remembers that she was at home on the day of the killing of the two young men because she was out of school that day (R. 284). She went to UALR. She was a student at the time. She was a junior. She completed her degree. Beside her self, Carlos Hayes was here at the address, 2200 Oak on the day of the killing. There were several people there. They were like five or six people there. Eddy Harris, Jr. was there. Her Father was there also. His name is Eddy Harris, Sr. (R. 285)

She attended college Monday through Friday. A normal schedule was until 12, and sometimes lab in the evening. In May, 2002 on the day of the killing, she was at home. School was out that day. Eddy Harris, Jr. attended the same college at that time, the University of Arkansas at Little Rock. If school had not been out, he would have been at college on that day. They went together. She didn't leave. She had a little girl at the time. That is the 5 year old at this time. She saw Eddy Harris, Jr. at the residence at 2200 Oak, all day period. She knew he was there all day because he was in the game room, the storeroom where there is a Television, video game set up. He was out there. There is a vent

She could hear them all day long; him and his friends. They came in and out to get stuff to eat, drink, and use (R. 287) the bathroom. That would include 4 o'clock in the afternoon. The rec. room is attached. You have to go out of the back door to go into it. It's right outside. It's attached to the house. You just can't walk through the house and get to it. You have to go outside and go into it. You can hear everything that goes on in the room because it attached through an air vent that attached to a bedroom. The vent is attached to the bedroom, so anything that's going on in there you can hear it inside the house. You can hear what's going on in the rec. room primarily through this air vent that goes from the house to the rec. room. On the day of May, when the young men were killed, I could hear EJ talking with his friends all that day. They were playing video games. You could hear them. (R. 288). She was not sure if EJ was employed at the time. She met with EJ attorney, Bill James, to tell him she knew the whereabouts of Eddy Harris, Jr. at the time the two young men were killed. And that was before the trial of Eddy Harris, Jr. Eddy Harris, Sr. arranged for me to meet Mr. James. Carlos Hayes and Keisha Epting and my father, went with me to meet Mr. James, (R. 289) I met with him alone. Maybe fifteen minutes.

She told Mr. James she was at home, that she saw him in and out all day and she could hear
him. Mr. James said he probably wouldn't have to call her as a witness because they ( the
state) really didn't have a strong case. She asked him if he didn't have to call her, not to call
her. She wanted to testify on behalf of EJ if was necessary. She just didn't want to get
involved with it. At the time she didn't think he would actually be found guilty on the story
of Johilda, who is a lying, cheating bad person. She does drugs. She lies and cheats people.
She steals. She thought (R.290) character would come into play when you are testifying
against somebody to go to jail forever. That the person whose word is being given would
have to have some standards, be a good person, with up to some type of standards. She
didn't think he would be sentenced to life based on the word of a criminal. She didn't
believe her brother would be convicted on Johilda's testimony based on her lack of character.
Johilda is her aunt. She's a troubled person. She has three kids that she didn't raise. She
will steal from anybody. She does drugs. She's been a prostitute. She has witnessed as she
grown up anybody tries to help her she stabs them in the back; done something bad to them
period. She's just basically the type of person that you just don't believe exist until you run
into them and you meet them. She has stolen from every person in our family. She has
stolen from my father all the time. (R. 291)
She has stolen items from all her sisters and brothers. She will steal anything. It can be
random. All the towels out of your bathroom, your tissue, a pen you have on the table,
money. Anything she can find, she takes. She is one of those types of people that have a
problem. I will never trust Johilda in my house. She could never come to my house just
because I know the type of person she is. She had a discussion with Mr. James about what
she knew about Johilda Harris's character. She told him similar things to what she testified
to. She realized she is under oath and are subject to the penalty of perjury. She realize if it's
found she have not testified truthfully she could be prosecuted and found guilty of perjury
and possibly be sentenced to jail or prison. I love my brother (R. 292). She wants him to be
released from prison. She is not willing to lie under oath if it will aide to get him released
from prison.

# STATE WITNESSES

## JOHIILDA HARRIS – FIRST STATEMENT TO LRPD

Johilda Harris is the Aunt of Eddy Harris, Jr. Her statement is: She remembers going to their house at the end of May, 2002. I went with Michael Ford. We ended up in the recreation room (R. 732). It was me, Michael Ford, Eddy Sr. and Eddy Jr. They were speaking about my nephew, Tony Jones. They were arguing about him changing his story he gave the police (R. 733). Eddy Jr. and Eddy Sr. were involved in that conversation. It was whether he should change his story or not. The Defendant did not tell me what his involvement was. Not on that night. I was later present in that same room later on that summer for a conversation when that came up.

At first, it was me, Michael, EJ and my brother, Eddy Sr. (R., 734). Eddy Sr. left the room. My nephew stated to me, "Yeah" Auntie, I shot the white boy. He said when Larue shot the black guy; he said the white boy pulled a gun. He said, "When he pulled up the gun, I pulled out my gun and just shot him down like a dog." They didn't state the exact address, but they just told me it was up on 12th street. They said it was over some money and marijuana. I did not go to the Police and tell them what happened. (R 735) because I told them I didn't want to have anything to do with it and they would have to take care of it themselves. I am telling the jury the truth about what he told me. I have seen state's exhibit 65. It is a disk and I listened to what was on it in preparation for trial. (R.736) Eddy Jr. and Eddy Sr.'s voices are on it. It's a conversation between the two of them. (R 737) I went to Wanda Tappin's house there I told her that EJ and Tony did it. She said no, that's not what happened, EJ did it. Then she gave me all the details. The majority of the time I was sitting there with my husband when all this conversation occurred. Nobody else told me that EJ killed them. EJ told me him self. It came directly out of the defendant's mouth. I didn't hear it from Wanda. She just said they are trying to flip the script on her son. (R 754) She didn't say EJ did it, he told me him self. She asked me if I heard from happened to EJ. I told her no. I haven't heard anything about what happened to EJ. She said they said they were trying to put it on Tony. That's all she said. Other than that it was no discussion because I didn't want to have no involvement in it. I didn't want to know more than what I know. I am telling the jury the truth and I have not benefited from this in any way.

Johilda Harris also stated that Wanda Tappin was to first to tell her what happened. She states that EJ told her what guns were used. When they started talking, (Eddy Jr. and Eddy Sr.) I (Johilda) left out and they started talking. They told Michael what kind of guns that they used. Johilda also said that Eddy Sr. told her they robbed them for their money and said they didn't get the money. He

what we said, Fay. What we said was that Tony did it." She didn't give me details of what happened."
She said EJ was the one that did it by him self. I reviewed my statement.

Defense Exhibit No. 2 is my statement to Ronnie Smith. According to my statement she did give me a
little more details than that. She said that EJ did it. Immediately then after she called Tony, Tony comes
over there. Tony calls Eddy. Then when he calls Eddie, that's when the whole thing blew off the roof
about everything. At some point she did tell me who shot who. She (Wanda) told me it was both of them
instead of EJ. She told me who shot who and what happened. She gave me all the details. At one time
we were real close to Eddie and his family. I have never lived with them. I have lived with both of my
wife's daughter's. When I gave my statement to Ronnie Smith, it was me, Johilda, and Ronnie Smith in
the same room. Another officer was with him. I told Ronnie Smith that EJ never admitted anything to me.
I told him I never really talked to EJ about it. It was always with Eddie senior and Johilda.

The first time I talked on tape to Ronnie Smith was on August 21, 2002. But actually the first time I
talked to him about this was on August 20, 2002. On August 20, 2002, I told him the defendant was
involved in this. I told him that the defendant admitted to me and his dad that he was involved in it. Then
Ronnie Smith took a taped statement from me. I wasn't going to get involved in this.

Wanda is my wife's sister. Tony is Wanda's son. Wanda told me the details about what happened and
that EJ was a part of this and Larue was a part of this. At that point I said no, they saying Tony did it. I
testified on direct that I knew EJ had admitted that he had done this and EJ's father said they had done
this, EJ and Larue. Wanda said that. She knew it too. I don't have no idea how she knew that.   Michael
Ford stated that EJ never admitted to him any involvement in these killings. (000144) 32.


## JARVIS MCKELLER

First, Mr. Keller did not witness the "act", which was the shooting of Mr. Dison and Mr.
Tedder. All he did was ride in a car that transported Mr. Hall to Mr. Harris's residence after Mr.
Hall knocked on the car window and offered and offered the driver $200 for a ride. (Abstract
50-54) He saw Mr. Harris only once, and that was at Mr. Harris's own home, not the crime
scene. (Abstract 50-54). Therefore, the first reliability factor militated against allowing the
pretrial identification to be presented to the jury.

Second, Mr. McKelller didn't identify Mr. Harris, Detective Smith did. Detective Smith
literally told Mr. McKeller that photo number three was Mr. Harris. (Abstract 58, Addendum
39) One can hardly imagine anything more suggestive than pointing to a photograph and telling

an interviewee that the one being pointed out is the one the interviewee is supposed to identify. That is precisely what happened here and this too should have impaled the trial court to suppress the pre-trial identification.

Third, the only person Mr. McKeller could positively identify from the photo spread was Mr. Hall. (Abstract 58). Identifying Mr. Hall, however, does nothing to buttress the reliability of his alleged identification of Mr. Harris.

Fourth, Mr. McKeller did not exhibit any certainty at all in identifying Mr. Harris. Had detective Smith not taken it upon his self to tell Mr. McKeller that Mr. Harris's picture was in the photo spread, Mr. McKeller would not have identified Mr. Harris. Mr. McKeller stated that when he went into the game room/wash room with Mr. Larue, (R.570) nobody was in there and at no time did he tell Ronnie Smith that anyone came in that room other than Mr. Larue Hall.

Fifth, Mr. McKeller had never identified Mr. Harris before and at the trial, told the jury he didn't know Mr. Harris. (Abstract 53),. Furthermore, even after having Mr. Harris identified by Detective Smith, Mr. McKeller deliberately fail to inform Detective Smith that he saw Mr. Harris at his home on the day Mr. Hall asked them to drive him there. (Abstract 61,62).

Sixth, Mr. McKeller's so called identification occurred over eighteen months after the shooting. ( Abstract 54). Mr. McKeller did not witness the shooting and only saw Mr. Harris once. (Abstract 53).

Applying the foregoing reliability factors to the fact of this case leads to just one tangible conclusion: Mr. McKeller's pre-trial identification of Mr. Harris was too tainted and unreliable to have been used in the case against Mr. Harris. This Court should reverse the trial court ruling denying the suppression of the pre-trial identification and remand this matter for a new trial.


## CHANDRA BASKINS

The Trial court abused its discretion when it denied Mr. Harris's motion in limine to prohibit Ms. Baskin from testifying that two weeks prior to the shootings, she heard Mr. Hall and Mr. Harris planning a robbery because her testimony on that point was irrelevant, unduly prejudicial, and inadmissible as a prior bad act.;

17

On May 8, 2003, over a year after the shooting, Ms. Baskin gave a one hour, forty-three page statements to Detective Smith, and nowhere in that lengthy statement did she say that Mr. Harris planned to rob the victims, Mr. Dison and Mr. Tedder, or that Mr. Harris planned to commit a murder. Under cross examination at the trial, Ms. Baskin was forced to admit that she deliberately withheld vital information from Detective Smith and she did so because he "didn't ask the right question." She further admitted that her testimony about hearing a robbery plot two weeks before the shooting was "new testimony." Clearly, Ms. Baskin's allegation about a so-called robbery plot was a fabrication. Even if was not, it was so devoid of the slightest indicia of truth or reliability that it should have been excluded as irrelevant under Rule 401 of the Arkansas Rules of Evidence. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R.Evid.401. By her own admission, Ms. Baskin did not hear Mr. Harris mention one word about Mr. Dison, Mr. Tedder, guns, drugs, money, or anything else pertaining to the shooting of Mr. Dison and Mr. Tedder. Whatever she claims she herd, it certainly was not something that can be described as making it more probable that Mr. Harris participated in a murder. Even if her statement could survive Rule 401 scrutiny, it should have been excluded under Rule 403. All relevant evidence is not admissible. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid.403. There is no probative value to Ms. Baskin's post hoc allegation that she overheard a robbery plot two weeks prior to the shooting because she conjured the whole thing up right before Mr. Hall went on trial. If, however, there was a shred of probative value to her allegation, it was substantially outweighed by the danger of unfair prejudice to Mr. Harris. Detective Smith was the lead investigator in this case and he stated under oath that there was no physical evidence connecting Mr. Harris to the shooting of Mr. Dison and Mr. Tedder. In fact not a single witness the State produced could establish that Mr. Harris even knew Mr. Dison or Mr. Tedder. Once the jury heard Ms. Baskin's contrivance that doomed any chance Mr. Harris had to receive a fair trial. It cannot be seriously argued that her "robbery plot" allegation did not convince the jury that Mr. Harris participated in the murder of Mr. Dison and Mr. Tedder. To allow such unreliable statement to be heard by the jury was an abuse of discretion and was a grave error. Mr. Harris should be able to receive a new trial.

A very high degree of similarity between the charged crime and the prior uncharged act is required. Evidence offered under rule 404(b) must be independently relevant and have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable that it would be without the evidence. Bragg v. State, 328 Ark. 613, 946 S.W.2d 654 (1997). In this case, there is no similarity, let alone a high degree of similarity, between Ms. Baskin's vague, uncorroborated allegation of a preexisting robbery plan and the violent deaths of Mr. Dison and Mr. Tedder.  At bottom, the trial court's decision to allow the jury to hear this spurious testimony was a consequential enough error that a new trial is the only appropriate remedy.

## INCONSISTANCY OF STATEMENTS

### JOHILDA HARRIS

Johilda Harris first stated that Eddy Sr. had said that Tony did it.

She next stated that it was Wanda Tappin that told her EJ had committed the crime.

She next stated that EJ told her himself that he killed the white boy.

She next stated that Eddy Sr. told her that EJ did the crimes.

She stated that Eddy Sr. was there when EJ told her he committed the crimes.

Johilda's daughter (Keisha Epting) has stated that Johilda herself said that Eddy Sr. asked her if EJ ever told her anything about involvement in a crime and she said "NO".

She also states that the very first time she heard this was when she overheard EJ telling his dad that he killed someone.


### MICHAEL FORD

Michael Ford has stated that EJ has never told him that he killed anyone, he only heard rumors.

He also stated that he first heard all this from Wanda Tappin.

He then stated that Eddy Sr. first told him that Eddy Jr. did it.

## JARVIS MCKELLER

Jarvis McKeller has stated that he never told Ronnie Smith that anyone entered the room where he was at, at 2200 S. Oak but Larue Hall.

He didn't know Eddy Harris Jr. but he supposedly picked him out of a line up.

## CHANDRA BASKINS

Chandra Baskin has stated that Ronnie Smith did not ask her the right question.  In her statement she said she was at a Motel in Conway when Eddy Harris, Jr. called Laure Hall to talk about the murders, but Investigators followed up on the Motel story to find that there were no records of her being at the motel at the time she claimed to be there.

## ONE WITNESS NEVER QUESTIONED – REGINALD FOSTER- (AKA; COOL CAT)

He himself admits his part in this crime and told witnesses.

## VIOLATIONS

**TREASON** – The offense of acting to overthrow one's government or to harm or to kill it's sovereign. To violate ones allegiance to one sovereign oath or to ones state. 18 USC c.115, section 2381, 2382 & 2384.  Treason is an unlawful incarceration of a living human being, in violation of the constitution as an officer of the court, and bound by oath.

**PERJURY**- Perjury Title 1746 of Title 28, United States Code in any proceeding before or ancillary to any court or grand jury makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined 10,000, imprisoned five years for each count, or both.

1. Violation of Property – Eddy Stanley Harris, Jr.
2. Violation of Contract
3. Violation of Fourteenth Amendment Right
4. Violation of Sixth Amendment Right
5. Treason
6. Perjury

## ACTS OF TREASON  AND VIOLATIONS BY WILLIAM BILL JAMES

1. Violation of Eddy Harris, Jr., rights, to not be prosecuted as a drunken man.
2. Mr. James was the Chief Prosecutor using two cases to imprison Eddy Stanley Harris, Jr., for the rest of his life. He took the words of a drunken man to use to convict him in both cases #CR2003-2315 and #CR2003-3900.
3. Violation of his rights to a just trial  (Sixth Amendment Right)
4. Violation of his rights to a proper defense
5. Violation of his rights to an impartial Jury
6. Violation of his rights to a juror that's not sleeping.  While at trial Mr. James had a note passed to him (twice) by his paralegal that Juror # 3 was asleep but he chose to ignore it
7. Violation of his rights to false witness created by the prosecution who were paid to testify
8. Violation of his rights of lying to Jurors about payment to witnesses
9. Soliciting Charles Stephenson, who was an inmate at  the Pulaski County Jail for information against Eddy Harris, Jr.
10. Charles Stephenson was offered $100.00 an hour to come to court and testify against Eddy Harris, Jr.  (handwritten statements from Charles Stephenson on three different occasions) shows Mr. James was not working for his client but against him
11. Allowing Jarvis McKeller testimony that EJ Harris never was seen by him; only that he had heard of him
12. Never questioned or brought eye witnesses to Eddy Stanley Harris, Jr., defense who could have excluded him as a potential suspect. He claimed to not be able to locate some of these witnesses
13. Mr. James did not feel he had to question anyone under the pretense of the prosecutors had no case and because of "**Trial Strategy and Tactic**"
14. Mr. James knew Eddy Stanley Harris had an alibi which Mr. James chose to not take into consideration.


## TREASON AND PERJURY CHARGES

1. **Marianne Satterfield - Act of Treason and Perjury**
2. **Don Johnson - Act of Treason and Perjury**
3. **William Bill James  - Act of Treason and Perjury**
4. **Ronnie Smith  - Act of Treason and Perjury**
5. **Michael Ford – Act of Perjury – 5 counts**
6. **Johilda Harris – Act of Perjury – 5 counts**
7. **Jarvis Mckeller – Act of Perjury – 5 counts**
8. **Chandra Baskin – Act of Perjury – 5 counts**

The Corporation State of Arkansas fail to protect Eddy Stanley Harris, Jr's rights as a citizen and as a Living Soul therefore, the Trust is taking full control over his contract, 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 by Power of Attorney.   His whereabouts could have been proven. Eddy Stanley Harris was found guilty with no evidence or facts and was given two life sentences without parole.  **No witnesses in his behalf were called because of "Trial strategy".  "Trial strategy" was the reason he did not not call not one single witnesss in Eddy Harris, Jr's defense.**

## PENALTIES

Penalty constitutes that each accuser receives the same sentence that was given to defendant and restitution to defendant as stated in the laws.

Lose of contract 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, between Eddy Stanley Harris, Jr. and the State of Arkansas. All powers are in the hands of Harris, EDDY STANLEY PRIVATE LIVING TRUST which has soul authority of contract 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, due to violation of Commercial Law and Constitutional Law that is noted above in this complaint. The State is completely incompetent in this case and in handling this contract 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  No payment of any kind should be made from this contract of any kind unless approved by HARRIS, EDDY STANLEY PRIVATE LIVING TRUST 42-9153507.

Perjury Title 1746 of Title 28, United States Code in any proceeding before or ancillary to any court or grand jury makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined 10,000, imprisoned five years for each count, or both.

### DEMANDS

1. Release from incarceration in 30 day
2. An Omnibus Hearing two weeks from the day of release
3. New trial on both cases

## **CONCLUSION**

The conclusion that all charges must be re-evaluated because of all errors that were allowed to take place with no consequences to anyone except the defendant who was convicted and given two life sentences without parole and not given an opportunity to be proven guilty beyond a shadow of doubt because of "**TRIAL STRADEGY AND TACTIC**" and no evidence. The State prosecutor's office should be commanded to turn over all records concerning this case for review.

All things are negotiable after the release and the Omnibus Hearing to said property to HARRIS EDDY STANLEY PRIVATE LIVING TRUST.

HARRIS, EDDY STANLEY PRIVATE LIVING TRUST
2200 S OAK STREET
LITTLE ROCK, AR 72204
(501) 661-0291

Eddy Stanley Harris, Sr., Trustee
PO Box 45391
Little Rock, AR 72214

Today's Date  9/23/04

Statement By Charles Stevenson

Frist Incident Date : 9/21/04

On 9/21/04 Bill James Come to visit me in T-unit. The Frist thing he asked me was if I know Eddy Harris, I told him yes I did. Then Bill James asked me if he had been talking to me about his case. like he's trying to find out witness aginst Mr. Harris. Thats why I got mad because Bill James was not even trying to talk to me about My case he's asking me about somebody elses case. I Told Bill James that I don't get into stuff like that so he could stop asking me about Eddy Harris case.



DEFENDANT'S
EXHIBIT
NO. 4

2nd Incident  9/26/04

Statement By Charles Stevenson

On 9/26/04  I Called Bill James  to ask Him about My Case. He was talking to me a little bit about My cause". He was like For someone that talked Eddy Harris  he don't talk about his Case to you.. I was on the phone and was like no he don't talk to me about  nothing. I was  like we ~~talk about~~ Free world ~~stuff~~ that it. then he told Me if I Could Find something out on his case it will help me on my case. He said if I Find witness agaist Eddy Harris he con get my Charge dropped to 1st degress murder. then he just told to find out something. I did not say anything then hung up.



DEFENDANT'S
EXHIBIT
NO. 3

000267

2nd Incident

Statement By: Charles Stevenson



DEFENDANT'S
EXHIBIT
NO. 2

I was in u-unit and Bill James to
visit Before I went to coort and he was talk
to me about My case. and I think I made him
mad and he stared braught up people case and
he braught Eddy harris case. He asked me if I told
Eddy Harris sr about what he asked and I was
like yes. He told me that they would pay me 100
dalor a hour to come to court. be a witness
against Mr. Harris, and I didn't say nothing. He
was like he had 3 murder cases one was about
about a baby that got hit and died. after that
he told me he would see me and court.